All right, we will begin with the first case, Katti v. Arden and Ms. Bateman. May it please the court, my name is Valerie Bateman. I am here representing Dr. Madhusudan Katti, the plaintiff appellate in this matter. We are here today to challenge the district court's dismissal of Dr. Katti's claims of race discrimination and First Amendment retaliation arising from his denial of tenure at North Carolina State University. Before you get in, just this is a purely factual question. Are you still seeking injunctive relief or are we simply talking about damages at this point? No, your honor. Thank you. No, your honor. You're not seeking injunctive relief? No, your honor. Which one is that? Are you doing A and B? No is not an answer. We are not seeking injunctive relief. Thank you. The district court erred in applying a heightened pleading standard demanding evidentiary proof. In addition, not just a short and plain statement of facts that Rule 8 requires, and by failing to draw reasonable inferences from the facts pled by Dr. Katti in his favor as this court and of course the United States Supreme Court, Nixball and Twombly, have required this court's decisions in woods and bing. Counsel, I'm sorry to interrupt you. Your time does not seem to be moving. I just wanted to alert our courtroom. Okay. Thank you. And I'm sorry if I'm leaning in. I am slightly hearing impaired and I have a little congestion. The first error the district court made was dismissing Dr. Katti's equal protection in 1981 claims because he had well pleaded facts which allowed inferences multiple well pleaded facts involving multiple situations which allowed the court to draw inferences that should have been in favor of Dr. Katti but in fact were drawn against him. Can I ask you just a broader conceptual question? We often see these cases brought under, you know, like Title 7 or various statutory claims. You've obviously brought this as a 1983 suit implicating the equal protection clause just to take the 1983 claim. Can you tell me a little bit like how you think that makes this different from a Title 7 case? And in particular what sort of strikes me is the the argument that your colleague made in the response brief which I think is correct is that it's defendant specific so that you have to plead facts with respect to each specific defendant. And so we got to think about Goodwin separate from each person. And your reply brief responds to that by just saying NC State does this and NC State does that and NC State did this other thing. Do you, sort of non-responsive to the question that it's got to be defendant specific, do you agree that it is defendant specific that we have to show that you've pled a cause of action with respect to each defendant and analyze each defendant distinctly or do you disagree with the premise? No, I totally agree with that premise because it flows from exactly the holding in Iqbal. In Iqbal, everybody else underneath Mueller and Ashcroft were left in the complaint because there were sufficient factual allegations that the court felt like showed they either knew or should have known about the conditions of confinement. What happened in Iqbal though was that the plaintiff failed to plead any personal involvement by Ashcroft and Mueller in the conditions of confinement in the real heart of the adverse actions that were being pled in that case. That case is different from this case in that Dr. Cotty's tenure package, not only did Dr. Gower, of course Dr. Goodwin had involvement in it because she was on the committee. But it's not just involvement, right? So your point is they have to be involved, that's fine, but in fact we have to look at Dr. Goodwin just as an example and we have to say have you met, plausible allegations met, every element of the offense looking at her in isolation, right? And so we have to look at what other, who are the similarly situated individuals that she treated differently than your client. Not whether NC State treated people differently, but what precisely did Dr. Floyd do with respect to similarly situated individuals? It's defendant-specific. You can't make, there's no respondent superior liability. This isn't a question about what NC State did or didn't do, but instead it's a question of individual defendant by individual defendant. I just want to make sure you understand, agree with the framework and then give me your best story for who you think you've like plausibly alleged facts for. Yes, your honor. I understand, I agree with the framework, I understand it's defendant by defendant. What I will say is that what the courts have said, even when there are multiple defendants, is that the plausible evidence can be looked at as a whole. But I will say with regard to Dr. Goodwin. Wait, I'm sorry, what case has said that we don't have to look at it defendant by defendant, but we can look at it as a whole? I'm not saying you don't look, I'm not saying you don't look at it defendant by defendant. Let me just accept that promise and move forward from there. The cases I'm talking about, say, when you're looking at the whole complaint, you look and see if there's evidence of all these things. Even if the evidence of a specific point would not be sufficient. If we start looking at it in the whole complaint, I mean, I have a lot of, I think Judge Richardson's point is a good one because a lot of these defendants were not even involved in this case at all. But if we look at it as a whole complaint, I have concerns about courts wading into the tenure process. And you submit this chart, but the chart has all these numbers and everything, but the quantity doesn't tell me anything about the quality. And in a tenure case, it might be that one individual, I mean, that one seminal article is worth, you know, ten that are not that good. And so I did not find the chart with just the numbers particularly helpful because that's not exactly the way that the tenure process always works. It's a qualitative process. It's a qualitative process. It's not a quantitative process in the way that you seem to want to posit it with respect to comparators. And it just, having the courts involved in the tenure process makes me, unduly involved, makes me nervous because I don't understand a lot of these areas. If you ask me to evaluate a tenure application for physics or economics or the Chinese language or what have you, I don't really have the background to resolve those kinds of cases, but . . . All I'm saying is, I think those academicians and faculty members who are engaged in this process have bring to it a familiarity with the subject matter that I don't have. I can get experts to help me, but that still doesn't . . . Luckily, NC State's already made that decision for you because the next year he got tenure. So he is tenured now. They have evaluated his application. What we're talking about is the year that Dr. Goodwin participated and Dr. Goodwin's articulations . . . Why should I assume they got it right the second time? Well, that's bad. Why do I have any more reason to think that they got it right the second time versus the first time? Well, they haven't . . . They might have decided . . . I've got no idea why they did it. I don't either, Your Honor, but what I will say is . . . But you agree I can't assume they got it right the second time any more than I can figure out whether they got it right the first time. Well, you can assume they changed their mind. The reason they changed their mind is you can infer from that that Dr. Goodwin was not involved. Dr. Goodwin was known . . . Let me just speak to Dr. Arden and Dr. Floyd because they seem to be the most remote, but they are not. When the tenure package goes through review, the entire tenure package goes. No, I don't want to leave Judge Richardson's point here about which is right, the first or the second. These lawsuits are going to lead to tenure inflation the same way that we now have grade inflation in schools. And the point is these tenure decisions will be made with the idea that we want to avoid having the plaintiff come into court. And the way that we avoid having the plaintiff come into court is awarding the plaintiff tenure. And so you lead . . . this whole stream of litigation leads to tenure inflation that's going to parallel grade inflation. And I'm just trying to explain to you why I'm a little cautious about wading into this whole process. It's qualitative. It's not quantitative. I'm working from a deficit of expertise and a deficit of knowledge. And I don't want to see external pressures put on the process such that it becomes less merit-based and the judiciary essentially installs themselves as guardians of the tenure process and takes it away from individual faculties involved. There are a whole lot of caution flags for me, whether one looks at the suit individually, which I think is an entirely valid point, or whether one looks at it globally, which I think is also an entirely valid perspective. Your Honor, I would have two things to say to that. One is that if there's a gatekeeping function to be done, it should be at the summary judgment stage, not the motion to dismiss stage. Because all the inferences at this point in the litigation should be drawn in favor of Dr. Cottee. And that means the chart, and that means Dr. Goodwin's participation, and that means the fact that Dr. Arden and Dr. Floyd reviewed the appeal and the fact that . . . recognize that there are cases like Iqbal and Twombly that do put some, in their term, plausibility, they do put some burden on the initial pleading that was not there before under the Gibson v. Conley view of federal rule 8. And it's a dramatically different situation, or let's just say it's a different situation. In this case, Your Honor, though, there were violations of the tenure process. And if the tenure process itself is not followed, that's not the case in every single tenure case. In this case, the process . . . Were any of these folks involved in the tenure decision for Delborn? Your Honor, I don't know, but comparator evidence . . . Okay, so just help me understand, like, how then is Delborn even plausibly a similarly situated individual? If we have no allegation that any of these folks were involved, we can't use him as a comparator at all, right? And I think I could do the same thing running down the whole list, right? Well, the comparator evidence is evaluated at summary judgment. It's not evaluated in a motion to dismiss this court. Not on equal protection claim. On equal protection argument, you have to allege a similarly situated comparator. You have to have similarly situated comparators, but the inferences at the motion to dismiss stage are drawn in favor of the plaintiff. Excuse me, the problem I have is the kind of inferences that you're drawing, which is that any adverse decision, you just say, well, it must be a matter of race. I mean, and that strikes me as speculation and not plausibility. When you say it can only be explained by race, well, that seems to me a real jump to say that a decision like that can only be explained by race. You have to explain why that's true. We're not saying at this stage of the pleading that it can only be explained by race. We're saying there are facts in this case that allow a plausible inference. I don't see them. You don't see them? No, I don't. Oh, my goodness. In fact, you talk about all of these different people who gave rather detailed reasons for, some of them were uninvolved, and others gave rather detailed reasons for why they arrived at an adverse decision. Dr. Cotty pled facts about how he was misled about the awarding of tenure to people when they come into the university. Who hired Dr. Cotty? I'm sorry? Who hired him? Who made that representation? Dr. Gower made that representation. Is it in the complaint who hired Dr. Cotty? Yes, Dr. Gower hired him. And what paragraph am I looking for for that? In 12, it starts at 12, and then there's 88 and 87. This is on joint appendix 13 is Dr. Gower is the head of the department. I'm sorry. JA what? JA 77, JA 78. And it says who made the decision to hire Catty? Who was the decision maker that hired Catty? I'm going to it right now, but what you're representing to me is that when I get there, that the person who made the decision is identified on JA 77. Which paragraph am I looking at? I am. Dr. Cotty came in 2016. You can draw the inference since Dr. Gower was the head of the department at that time that he was the person who. Why would I plausibly draw that inference? Because that's not who grants tenure. In most of places, the department head is not the person that hires. It's the provost or the president. Why in the world would I draw that inference? I'm happy to draw all reasonable inferences, but why possibly would I draw that inference? Because Dr. Cotty pled it and because you have to draw inference. Where? Where? Where did he plead it is what I'm asking you. And you said JA 77 and it doesn't say that. No, it says that. But I will tell you that Dr. Cotty also pleads specifically in paragraphs 104 and 105, and that's on JA 97, that prior to Dr. Cotty's coming to NCSU, he was a tenured professor. And he left that position to come to state as a non-tenured professor only because he was told by Dr. Gower during negotiations that neither the department nor the college offered tenured appointments. After he agreed to come as untenured, he learned that the department did, in fact, hire at least three individuals as tenured. Excuse me, counsel. Judge Wilkinson, could I ask a question about the First Amendment claim? You certainly may. Could I just – I want to understand the First Amendment claim. Do you presumably don't take issue with the proposition that it violates the First Amendment to say I think you're a bad teacher, I don't want to tenure you? No, what happened in this case is we would argue – No, I understand. I know the claim is not that case. But I'm trying to understand – so if we all posit that a university has to be able to say I don't want to hire you because I think you're a bad teacher, I don't want to tenure you, I think you're a bad teacher, and the person responds but actually I think I'm a great teacher, the university can say I respectfully disagree, I don't think you're a good teacher. So what's the difference between that if we posit that they can do that? What's the difference between that and what you're alleging here? Because based on your complaint, I don't really understand what these unconventional teaching methods are and why that's a First Amendment problem. Well, it's like – it's not exactly similar but it's very similar to Garcetti where you had somebody doing their job who saw an affidavit that had misleading or false information. That's a whistleblower situation. This is about someone who just wants to teach the way he wants to teach and his bosses don't want him to teach that way. There's no independent evidence that he's not a good teacher. They don't like how he teaches. There's no evidence that he is not effective as a teacher. Why don't they get to decide that without the First Amendment countermanding their view about whether he's a good teacher or not? They might get to decide that at summary judgment, but on the motion to dismiss, they have to take his facts in the light most favorable to him. Thank you. This clock is going up. Am I over my time? Yes. Thank you very much. Thank you. Smith, pleased to hear from you. Good morning. May it please the Court. My name is Lindsay Smith. I'm a Special Deputy Attorney General with the North Carolina Department of Justice. I'm here with my colleague, Jeremy Lindsley, and we represent the defendants' appellees in this appeal. So as the allegations in his amended complaint reveal, Dr. Cotty's colleagues were concerned about his performance in a number of areas, and those concerns resulted in the denial of his original application for tenure. They focused on a failure to appropriately mentor students and to fulfill his obligations in a co-taught course, as well as mediocre student reviews of his courses. However – So why did you change your mind and grant him tenure? There's no evidence in the – or excuse me, there are no allegations in the record, Dr. Hytens, about – or excuse me, Judge Hytens. You're great. About why – It would be a serious promotion. It would. I'm not entitled to it. No PhD. But there are no allegations in the record as to why the tenure decision was different the second time around. I will say that Dr. Cotty's original application for tenure was made in June of 2019. His – I believe the – I don't know if there's allegations about when his second application was made, but he was granted tenure in, I believe, April of 2023, and so there's a significant time difference between the two. But he was offered to reapply for tenure. He did. As I stated, he was granted tenure in April of 2023, and he is still a tenured faculty member at NC State to this day. But as we've already discussed, this case involves a straightforward analysis of Dr. Cotty's allegations to determine whether he pled fact sufficient to infer that the denial of his original application for tenure was the result of race discrimination or in retaliation for his First Amendment rights. So just a framing question. Do you agree if – and I know that you are not going to agree that he actually did this, so this is a counterfactual from your perspective – if he plausibly alleged that he was treated differently from a similarly situated white comparator, that would raise an inference of race discrimination for purposes of the plausibility standard? For purposes of the plausibility standard, I think I have to agree with that, Your Honor. I think so, too. I think I have to agree with that. But defendant-specific, right? You should have to show a white comparator that Dr. Goodwin treated differently, not that NC State treated differently, right? Correct, Your Honor. And I would say that's specific to the equal protection claim. And the reason I say, Judge Heitens, that I think I would have to agree with that, the equal protection claim you have to allege that the defendant – or excuse me, the plaintiff was treated differently from others with whom he was similarly situated and that the treatment was the result of intentional discrimination, right? Well, but hold on. He's got to prove that in order to win. I apologize. He has to allege that. I misspoke. So he has to allege that he was treated differently from others from whom he was similarly situated. In this context, it's very difficult to determine who is similarly situated to others. We have this chart with these numbers and everything, but they don't – that doesn't really do anything for me because it doesn't go into the qualitative aspect of it. And it's very hard in this kind of process to know who is similarly situated to who else because each tenure decision is very individualized, and each tenure decision rests on a number of subjective and objective judgments having to do with teaching ability and having to do with scholarship and having to do with administrative contributions and a whole lot of things. And there's room for difference of opinion on that, and they're very individualized situations. And it just seems to me the context in the particular setting is – a very treacherous and sort of tricky undertaking. Do you see what I'm saying? Absolutely, Your Honor, and I would agree with that. I mean, I don't think –  There's a tenure exception to the Equal Protection Clause into Title VI and to Title IX? You can just say tenure is super hard, so you can't sue for equal protection violations for tenure? So that's – That's what you agree with? I would not agree with that. I didn't think you did. I would not. So I think I would agree with Judge Wilkinson that I think he's correct, that it is difficult in the tenure context to allege a similarly situated comparator. I don't think it's impossible, Your Honor, but what I would say is that here Dr. Cady hasn't even come close, right? I mean, the comparators that he points to – I should make it clear that I'm not arguing for a categorical tenure exception to anything. I'm just trying to state more modestly that it is – there are difficulties that are inherent in this process. You can overcome those, but I don't think the pleading here plausibly does. That's the problem that I have. But I'm not a categorical person, and I'm just having problems with the particular case that's being pled and the difficulties involved with that and the fact that all of the individuals fall into one of two groups. One of the groups involves people that were not involved in the process at all or were only very marginally involved, and the other group of people like Ms. Goodwin and others who gave detailed reasons for their appraisals and had actually co-taught a course with the individual or had been involved with the individual in some way that gave them a basis for appraisal. And so you have these – in this particular case, there are all kinds of parties brought in that have nothing or little to do with the process, and the people that did have something to do with the process spelled out their reasons in some detail, and they seem to go to the heart of how you evaluate the application. But I'm just – I would never argue for any kind of categorical exception. All I'm suggesting is that as an individual case here, I'm just not sure the plausibility standard is met, but it's a very individualized kind of situation, and I just think in this particular case, I'm just not certain that the plausibility standard has been satisfied. It may come down the road, different case, where it's much more arbitrary or what have you, and be altogether different, but not here. I mean, Ms. Goodwin's comments were – she had both a good place from which to evaluate it, and her comments went right to the heart of the assessment. That's correct, and I would say with respect to the specific allegations regarding the individual defendants, I think to Judge Richardson's earlier point, specifically for Drs. Goodwin and for Gower, I mean, I think the place that you really only get the – any allegations that there were racial motivation, I mean, I think the district court was correct to say that there's a lot in this complaint about the process and the unfairness of the process, but there is conspicuously little regarding race. So if you look at paragraph 190 of the complaint, and it's JA119, and that's really where we get – I think it's one of the only references to the racial motivation here. Dr. Goodwin's animosity seemed to arise from her stereotypical view of men, of Dr. Cotty's race and ethnicity, and the enabling of Dr. Goodwin by Dr. Gower. So let's posit that I agree that the allegations about Goodwin's specific bias seem to me to have real Twombly Iqbal problems, because just because you say over and over again she disliked me because of race doesn't mean that you plausibly alleged that she disliked me based on race. Let's posit that I have a lot of sympathy for that. I'll just tell you what my biggest hesitation is. It's paragraph 213, and it's the one where we do a detailed comparison between Dr. Cotty and Delburn. And, look, I take the point. You may well have great arguments. There may well be at summary judgment or at the merits, there may be great arguments for why these two people are not actually similar. Judge Wilkinson makes the point about the one amazing article versus the ten mediocre ones, and that may be true, and you might win at summary judgment. You might win at trial. But looking at this chart, and I'll also further posit I'm not sure this would get them there with regard to all the defendants. I'd have to think about which defendants it gets them there with. But this, at least to me, looks pretty prima facie plausible of an allegation that Dr. Cotty and Dr. Delburn are similarly situated, or at least if we say this isn't enough to allege you're similarly situated to survive a 12B6 motion, we are making a very high standard for pleading similarly situated at the motion to dismiss stage. So walk me through. What's your best response to paragraph 213 of the complaint? So there's a couple of points I would make to that, Judge Hytens. I think the first is, I think to a point that was made earlier, there are no allegations in the complaint about who was on Dr. Delburn's tenure review committee, right? So there's no allegations that any of the individual defendants were involved in his tenure review committee. And so there's no allegation. There's no basis from which this court or the district court could infer that the individual defendants treated Dr. Delburn differently because of his race. And is this partly a problem? I'm just trying to also figure out, because again, I had the same reaction to Judge Richardson when I picked up this case. I was like, this is a Title VII case. I don't understand why this is a 1981, 1983. This is the most straightforward. I don't mean who wins, who loses. But I just look at the allegations of the bad thing that happened to me and who did it. It was like, this is a Title VII case. So is that a 1983, 1981 specific? Because if it was Title VII, the university would be the employer, be the defendant, right? That would be the defendant if this was a Title VII case. That is correct, Your Honor. And would this all necessarily play out the same thing of like – because then could you say that all of these people were acting on behalf of the university and all – I guess what I'm saying is we're going like who's on what committee. Is that a 1983 specific thing? Or would that apply in a Title VII case too? So I think it would be less applicable in a Title VII case, Your Honor, because it's the 1983. I mean, these are – the 1983 claims are brought individually against the defendant. NC State is not the defendant in this case. NC State is not being sued. That is correct, Your Honor. These are individual – and there were official capacity claims in this case. Those were dismissed by the district court and have not been appealed by Dr. Cotty. So the only claims that are at issue before this court are the individual capacity claims. Okay, thank you. I interrupted you. You had a couple points on that paragraph. No, no, that's okay. So that was – my first point was because those individual defendants – I would also say that the allegations in the complaint I think are insufficient to show that he is not similarly situated in other aspects. I mean, for example, the chart on the previous page on JA-124 – I'm not talking about those other people in that chart. I'm talking about the Delborn allegations. I understand, Your Honor. So on that chart, Dr. Delborn, it's indicated that he was hired in 2013. Dr. Cotty was hired in 2016. There's nothing in the complaint – So three years as a matter of law is long enough to prevent people from being similarly situated? No, Your Honor. I guess what I'm trying to say is there's nothing in the complaint to – Because I would agree. Look, if Delborn was hired in 1975 or 1989, I think we could say that does not plausibly allege you're similarly situated to someone hired in 2016. But I'm a little reluctant to say that 2013 and 2016 are far enough that it's not plausible. I think the point I'm trying to make, Your Honor, is that there's nothing in the complaint to indicate when Dr. Delborn was granted tenure. And so there's nothing to indicate how long – So I thought your answer to that – to Judge Hyten's question was going to be totally different. And so help me understand why the answer to this isn't – This is a comparison of the writing quality, the publishing quality. But nobody in this process has suggested that Cotty didn't get tenure because he wasn't a prolific publisher. They said he couldn't teach and that he had interpersonal problems. And so you've got to have a comparison of similarly situated in the similar ways that affected him. And so the fact that they were equally good writers, whether that's true or not – I'm not sure that this actually shows it, but I take Judge Hyten's point to be maybe plausible, maybe. But what it doesn't do is actually address the similarity in the relevant respect, which is nobody said that he doesn't get tenure because he's not sufficiently – or the primary reason is not he's insufficiently prolific, that he's not publishing enough papers. It's that he's a bad teacher and that he's got interpersonal problems. And so if you had a column that – or maybe, I guess, it's rows at the bottom that said, you know, Delborn also, like, noted bad teacher, right? They're both noted as bad teachers, and they're both noted as having interpersonal problems. Well, then it would be a reasonable comparison. But you don't get to just pick writing and say they're similarly situated as writers and suggest that that means they're similarly situated for equal protection analysis by ignoring the very thing that caused Dr. Cotty to be denied tenure. That's exactly right, Your Honor. I mean, and that was going to be my third point is that – and I would say this court has repeatedly acknowledged, especially when you have a case where we're talking about a performance case and the plaintiff is attempting to allege comparators, that you're exactly right, that the plaintiff, in order to allege a similarly situated comparator, has to show that that comparator was situated with respect to their conduct and with respect to their supervisors and in terms of the... One question in addition here. There's a plausibility standard, and what repeatedly comes up is, well, this can only be explained by race. Well, I mean, that in itself, those kinds of statements are conclusory statements that may have been acceptable under the old Rule 8, but are not... You can't plead the conclusion without giving some reasons for the conclusion. And when you say, well, the difference in outcomes can only be explained by this, can only be explained by that, well, the question is, why is that the explanation? And you can't just... And what's been done here is to plead a conclusion without saying why the conclusion is a justified one. And that can't be plausible to just say this can only be explained in this way. You have to go into it, at least somewhat. And, you know, I mean... I think that my fine colleague says, of course, there is a difference in 12b-6 and summary judgment, but 12b-6 requires something. I mean, plausibility means something. It doesn't mean a whole lot. I don't want to raise the bar, but it does require something. Yeah, I agree completely, Your Honor. I mean, I think that's the main concern that we have raised about these allegations about the individual defendants, and I would point this court to its recent decision in the Nadindla case. We cited that in our brief. You know, I don't think any one of us wants to be judged by a decision we make, and then somebody says, well, you know, your motive can only be... or this can only be explained by a bad motive. You had a bad motive, and it's only... and this can only be explained by this terrible motive. Well, my response would be, well, why do you say that? You're simply jumping to a conclusion and depriving me of any presumption of innocence or depriving me of any presumption of legitimacy? And you say, no, you can only... what you did can only be explained by this nefarious, malicious motive that you had. Well, why? That's correct, Your Honor, and I think the Nadindla case is directly on point, and what this court held there, there was a physician who had been revoked hospital privileges to Wake Med, and in her complaint, this is, again, this is another 12b-6 dismissal that was challenged on appeal, and in her complaint, she made similar, very generalized allegations about the way that Wake Med had treated other white physicians but didn't allege any specific facts to underlie those conclusory or speculative statements. Can I ask you about the First Amendment claim? Are you aware of any decision other than the Sixth Circuit's Meriwether decision that talks about, like, whether teaching methods are protected by the First Amendment? This seems like a really potentially tricky, hard question. It is a tricky, hard question, and I have not recently looked at the appellate decisions. I mean, there are cases... I would say there's cases out of... Because these academic freedom cases, right, to me, tended to be more like viewpoint or content discrimination, like, you know, saying, actually, you know, Marx had some good ideas, or, you know, things like that, and, you know, criticizing the war in Vietnam in a class about history and political science. They don't tend to be cases about the way that I teach is the First Amendment claim. That's correct, Your Honor. I mean, Meriwether, I think, is sort of the closest... But, again, it's about the content and not about the method for teaching, and I think that it kind of goes to, and I think Your Honor has alluded to this already, this is the main problem with the First Amendment claim, is that what we would say is, you know, if the way that you teach is... and being sort of actions taken based on the way that you teach is a First Amendment problem, then there is no way that any university could ever provide feedback to a professor or take any action against a professor based on poor teaching. And I think that's certainly not where this Court wants to end up. I mean, I think we've also made the argument, you know, that it's certainly not a specific enough allegation of a specific enough statement or conduct to even get into the First Amendment analysis. Now, you know, I think that there are other... The First Amendment analysis has multiple other steps, and we've argued in our brief that the plaintiff has failed to meet any of those steps. And, in fact, on their reply brief, they don't even mention the balancing test. They don't even mention the but-for causation standard. I think for that alone, they've conceded those points. Thank you. You're welcome, Your Honor. Can I ask one other question, if you mind? One of the things that I just am curious about, maybe, again, sort of like Judge Hyde's question, might not end up being relevant to the opinion here, but your colleague on the other side alleges that Indian men are chauvinistic and disdainful of women as a stereotype. I confess I'm not, like, all that up on all the stereotypes, but what do we do with that? I mean, it's just like a bald assertion that Indian men are stereotypically chauvinistic and disdainful of women. And she's relying on that to say that that, you know, must be why Dr. Goodwin, who I presume in this context is a woman, therefore, like, is against him. We have some stereotype cases where we seem to sort of, like, accept stereotypes just being alleged. How would you have us think about, you know, such a... I don't know. It's sort of a new one to me, but, like, what should we do to evaluate an allegation that there's a stereotype that, at least to me, is not, like, widely known or accepted? So I think, Your Honor, I think the question maybe... A better way to phrase the question is, what do we do about the allegation that Dr. Goodwin held such a stereotype? Well, but they don't actually allege... So there's no allegation... Well, maybe her stereotypal, right? So maybe it is that she held that view? That's the way I read the complaint, Your Honor, is that the allegation is that she held this stereotypical view. And so I guess I don't know that this court needs to even... But if it's not... Eh, okay. I mean, I guess what I would say is I don't know that this court needs to evaluate the allegation that there is a stereotype about Indian men as chauvinistic and disdainful of women. I think the allegation, at least the way I've read it, is the allegation is that Dr. Goodwin held this particular view, right? But it's different than just saying she held this view and saying that, like, this view is a common... I mean, in fact, what she's saying is she held this view and it is a common one, which, in some sense, I take the reason it's pled that way is to lend credence to the, you know, sense that this must be her view. Yeah, I mean, I think what I would say, Your Honor, and I realize my time has run out, but I'm happy to respond briefly. I think what I would say is that regardless of how we view that, there's no other allegation in the complaint about such a stereotype. This is the only allegation in the complaint, and as this court, as Iqbal has held, threadbare recitals supported by mere conclusory statements just simply don't suffice to satisfy the 12b-6 standard. Well, and the point my colleague raises could be it's so broad it could be used in any discrimination case where the plaintiff and the defendant are of different genders or different ethnicities or whatever, you could say that just, well, the person of this ethnicity has a stereotypically prejudiced view of all people in a different race or ethnicity, and so the stereotype would be just there to pull out of the drawer for any case in which the racial or ethnic background was different. I mean, and if that were to do the trick in terms of plausibility, we would be in a very difficult position indeed. Yes, I agree, Your Honor. I mean, there's no limiting principle there. I agree, Your Honor, and that's what we would say. It simply doesn't meet the plausibility standard. My time has elapsed. I'm happy to sit down for the reasons that we... Hold on for one second. Yes, sir. I'm good. I'm very good. Thank you. Are you okay? All right. Thank you, Your Honor. We would ask that this court affirm the district court's opinion. We thank you, and Ms. Bateman, you have time for rebuttal. Your Honor, there is no question but that there was a policy that said that the committee members have a responsibility to recuse themselves from voting if there's an actual appearance of a personal or professional conflict of interest. So even if we assume that we don't know why Dr. Goodwin was biased against Dr. Khadi, she should not have participated in that. Maybe as a matter of NC State policy, but I can't possibly imagine why the Equal Protection Clause requires that. No, Your Honor. I'm just... I guess... I'm trying to understand. So let's pause it. I think the complaint make does a very good job of plausibly alleging something, which is that Dr. Goodwin really, really, really did not like the plaintiff. I think it alleges that pretty well, or at least plausibly alleges that pretty well. But would it... Okay, fine. And maybe based on the university policy, based on that, she should have recused. Maybe. Maybe. I'm granting you lots of... Not good. I'm granting you lots of assumptions here. But even... Let me spot you for the sake of this question, all of that. I don't understand what that has to do with whether this violates the Equal Protection Clause. Maybe it violated university policy. Maybe. So help me... Let's assume, and I'm not even saying I agree with you on all of the premises here, but maybe... How does... You started your rebuttal by saying she should have recused, and then I say, okay. Why does that violate the Equal Protection Clause that she didn't? Because it's one of many examples of how Dr. Cotty was treated both in violation of policies and... But this isn't a claim for violation of policies. Well, the evidence in a 1983 case and the evidence in a Title VII case are the same except for tagging individual defendants. And you can still use the amalgamation of the evidence of pretext in the complaint to establish a case that gets you past a motion to dismiss. And we would submit in this case that's what Dr. Cotty did. He has 200 paragraphs of allegations from which an inference of pretext can be drawn. I go back to the initial premise. Why in the world should Dr. Goodwin have recused? I don't understand that. In these tenure decisions, this individual, Dr. Goodwin, would be the very one whom a tenure committee, whose views the tenure committee would be soliciting. And Dr. Goodwin had comments that were highly relevant to the decision in which to criticize for failure to teach an introductory course and failure to mentor graduate students and that the students in the course were a jumping ship to Florida State and all the rest. Dr. Cotty's complaint, though, alleges that none of those were true. What you're saying is that Dr. Goodwin has very highly relevant information and she should be involved in the tenure process. It might not be the policy you or I would make, Your Honor, but North Carolina State's policy says if she has a personal or professional actual or appearance of conflict of interest, and clearly her statements of bias made to Karen Cooper and Dr. Gower were evidence of more... Wait, statements of bias? What were the statements of bias? Her stating to Dr. Cotty that she could not work with him, the criticism of him over an issue that he had consulted with Dr. Gower. But I can say, for example, that there's a given lawyer who I think makes ridiculous arguments in a way that I do not like. That doesn't make a conflict of interest. They just might be making ridiculous arguments. That's not a conflict. So if I have in a professional setting a view about somebody's competence, that does not create a conflict of interest. I have a conflict of interest if I have some non-merits-based problem. But I guess I'm just not following when he says, I can't work with this person because they have interpersonal problems. That's not a conflict. That's just like a recognition that this person is not a competent professor. And if you keep that to yourself and you don't tell it to other people and you're not trying to influence other people to disregard that lawyer's conduct, then perhaps that would just be an assessment of that individual. But your view is it becomes a conflict when I go back and I say to my colleagues, that argument was ridiculous. Yes. Well, Your Honor, it doesn't become a conflict. It becomes the appearance of a conflict. You don't have to say the argument is ridiculous, but if you say the person is ridiculous, and that's what Dr. Goodwin was doing is she was attacking the person to such an extent that her own colleague tried to talk her out of serving on his tenure panel because she knew it created the appearance of a conflict of interest. Well, you're getting too close to the proposition that any negative comment about somebody during the course of a tenure evaluation is evidence of bias, that you can't make a negative statement about anybody without somehow being accused of bias, and that deprives the tenure process of a full flow of information. Even one of the individuals who was on the tenure committee with Dr. Goodwin said that her behavior during the tenure deliberations made it very difficult for them to write a balanced report. Other people recognized that she went beyond what just disagreeing with the quality or quantity of his research teaching service was, but that she actively tried to poison it. The point, though, is here, Your Honor, he's got plenty of facts in his complaint that allow an inference, a plausible inference of discrimination and retaliation, and on a motion to dismiss, it's not this Court's job to say whether he will or not be able to prove that. At trial or at summary judgment, the district court should have said there's enough here to get us over the line from speculation to plausibility. You don't need to fill in any blanks here. This is clearly a case... I'm sorry, Your Honor. I know you don't like the outcome of the initial decision, but the hard part is linking that up in some way to racial bias, because there may have been a personality conflict between Dr. Goodwin and whoever, and I don't know. In any tenure decision, some people are vigorously engaged and don't believe tenure should be awarded, and they feel that with a real sense of conviction, but I don't understand how all that gets related to race as opposed to a personality conflict or opposed to a difference of opinion. Every difference of opinion should not be open to the suggestion made in the complaint. Well, this can only be explained as a matter of race. No, that's not right. It can be explained by a difference of opinion, a personality conflict, a difference over teaching methodology, or a million different things, and you've got to clear that bar. You've got to relate this to racial considerations in a way that was not done here. I absolutely agree, Your Honor. You cannot just say, I am Indian and I didn't get tenure. That's not what Dr. Cotty is saying here. He's saying, I am Indian, I didn't get tenure. There were people who tanked my tenure bid, and there's lots of violations of policy from which you could draw inferences of pretext. Okay. Thank you. Thank you. Let me ask my colleagues, because if they have further questions. I'm good. You okay?  Yes, I'm okay. Okay. Thank you very much. We'll come down and re-counsel, and then we will move right into our next case.
judges: J. Harvie Wilkinson III, Julius N. Richardson, Toby J. Heytens